Nott, J.,
delivered the opinion of the court:
These are actions brought under the “ abandoned and captured property act” to recover the net proceeds of two steamboats, the “John F. Carr ” and the “ Colonel Stelle,” which it is alleged amount, of the one to $900, and of the other to $2,200. Of the former the claimant, Gearing, was the sole owner, and of the latter the claimant, Richardson, also owned a fourth part. The two cases are submitted upon the same evidence, and will be considered together.
As to the claimant Gearing, he has testified as a witness on his own behalf, and his rights may be determined entirely by his own testimony. He says, among other things :
“In 1860 1 built two steamboats in Pittsburg, viz., the “ JohnF. Carr” and the “Colonel Stelle;” I built them for gentlemen of these *170 names living on Trinity river, Texas. These two boats cost me in the aggregate about $38,000; I was to deliver them at Galveston, Texas. I sent or took them both there. The parties who engaged them I found there, but they refused to take the boats, and they were thrown back on my hands. I was the sole owner of the “ John F. Carr ” and of three-fourths of the “Stelle.” The other fourth of the “Stelle” was owned by James It. Richardson. After these boats were thrown back on my hands 1 ran them on Trinity river. I tried to sell them, but Jailed to do so on account of the excitement produced by the rebellion or the anticipation of it. I could not get the boats back, and they were taken from me by the State of Texas, in consequence of reports there that I was an abolitionist. The State of Texas returned the steamers to me after about three weeks’ detention, when these reports were denied by letters from Pittsburg, and the boats were returned to me by the intervention of masonic friends in Pittsburg. This was a short time before Fort Sumter was fired upon. After this I was taken sick and went home to Pittsburg,- this being in the fall of 1861. My creditors thought these steamers, if left in Texas, would be confiscated if it was known I was in the north, and they insisted upon my returning south. After my return there, these steamers were taken from me by an order from General Magruder, a Confederate general. I did not consent to their being taken, but protested against it. The vessels were appraised after they were taken. I in no way attempted or tried to obtain payment for the steamers from the Confederate government. I understood that other owners were paid for steamers taken in the same way by the Confederate government. They were taken by the Confederate government in 1862. The United ¡¡States. forces got possession of them at the time of the surrender of the rebel forces. I was involved at the time I built these boats about $18,000 outside of the insurance, and hence under obligations to listen to the suggestions and requirements of creditors. During all this time I was loyal to the United States government. I could not 'talk much in Texas in favor of the United States, as it would have caused my imprisonment. I never did aid, comfort, or encourage the rebellion against the United States. I never did any act voluntarily in favor of the Confederate States. Being well known there as a mechanic, General Magruder called on me to superintend some of the cotton-clad boats, and I tried to get out of it by recommending some. one else, whom I represented as more competent than myself, and I did all in my power to escape this service, but I was compelled by an order from General Magruder to do this work, for which I received no compensation whatever, nor did I *171 receive any vouchers or siga any pay-rolls, though other men, who worked in the same way, did receive pay for their services.
“ I returned to Pittsburg in May, 1864, and immediately thereupon an excitement was raised about my disloyalty, and I was arrested by order of General Rowley, who, after an examination of three days, discharged me, after an imprisonment of five weeks in the common jail.
• These reports were started and circulated by a Mr. Millingar and his friends. Mr. Millingar had a large amount of my money in his hands for which I had sued him, and this was the cause of his persecution against me, and they hoped thereby to compel me to run off.”
And upon his cross-examination he adds :
“Mr. Millingar was my brother-in-law, having married my sister, and the money in Ms hands was the proceeds of cotton sent by me from Texas, and which I succeeded in getting through the blockade, shipped on board the Reindeer, owned by myself, and with the usual customhouse papers issued by the Oorfederate authorities at Houston, Texas. I purchased the Reindeer in 1862, and for this voyage the papers were taken out for Havana or a market. She was commanded by a man named Stevens, who was unknown to me, except that he was recommended as a good navigator. I had owned no other vessel prior to this, and she cost me $10,000 in gold. This was the only trip made by the Reindeer, and she was captured by the United States naval forces in the Gulf, on her way to Havana. Whether she was condemned in a prize court or not I cannot say, but I presume she was. I had 288 hales of cotton on the Reindeer at the time of her capture, and the said cotton found its way to New York, but in what way I don’t know. I had a confidential friend, Mr. B. 0. Hamilton, of Galveston, who was first mate on the vessel, who was to act with the supercargo, my son Franklin, in getting the proceeds on to Pittsburg for distribution among my creditors. From January, 1861, to the fall of 1862,1 was in Texas, except an absence therefrom of fivé or six months, when I was at home in Pittsburg, Pennsylvania. And 1 was speculating, after the seizure of my vessel, mainly in cotton, buying and selling in Texas. I was in Matamoras in July, 1863, (but not at any other time,') trying to get some cotton there for sale, in order to raise funds by bills of exchange to remit to my family at Pittsburg. The draft purchased there was sent to New York. The Confederate government, by order of Kirby Smith, took my cotton, (to the extent of 264 bales,) along with all other cotton within their reach, and that much, in that way, I lost. Beyond the voyage of the Reindeer I had never attempted *172 to run the blockade, and I confined my cotton operations to the States of Texas and Louisiana. In the spring of 1864 I had 800 hales of cotton, all of which was lost to me, being some of it jay hawked, and the rest burnt within the Confederate lines, and by their authority, near Alexandria, Louisiana. AU these commercial transactions of mine in Louisiana and Texas were carried out within Gorfederate lines’’
From this evidence it appears :
1. That this claimant; by his “ commercial transactions,” carried on, as he says, “ within the •Confederate lines,” was guilty of violating the fifth section of the act of 13th July, 1861,(12 Stat.L., p.257,) prohibiting and declaring unlawful “ all commercial intercourse ” between the citizens of the insurrectionary “ and the citizens of the rest of the United Stateswhich violation of a statute intended for the suppression of the rebellion was in itself an act of aid and comfort given to the rebellion.
2. That the claimant, by passing within the military lines of the enemy and by fitting out and running a vessel through the blockade maintained by the United States, made himself voluntarily one of the common enemies of the country, and having failed in the true allegiance which he owed to his government can maintain no action of any description in this court.
3. That the claimant, by giving his mechanical skill “ to superintend some of the cotton-clad boats ” built by the enemy to war upon the United States, gave to the rebellion aid and comfort in violation of the statute under which he seeks to recover, and that no pretexts of unwillingness can make the act an involuntary one, when he voluntarily twice went within the enemy’s lines, and placed himself again and again within the command of a Confederate general.
It is proper to add that the claimant’s testimony is not without many protestations of profound loyalty to the country whose laws he was defying, and with whose enemies he was holding treasonable intercourse. Such averments only add to the moral guilt of the offender, and are as ineffective to purge his offences as the protestations of any criminal who, when brought before a magistrate appears full of godly sentiments and morality and religion. The counsel for the claimant has, with great earnestness, urged that “ he made a journey of 350 miles, from Houston, Texas, to Natchez, Mississippi, in the fall of 1863, to convey information to General Gresham of an attempt to ambush Generals Banks and Franklin in the Bayou Teche expedition. This journey was made overland through a section of *173 country infested with robbers and guerillas, and manifestly tbe most dangerous of any within the theatre of war.” But unfortunately for this panegyric the claimant’s testimony shows that he travelled with perfect ease and freedom through the scenes of his “commercial transactions,” appearing one day at Alexandria, in Louisiana, and another at Brownsville, in the furthest bounds of Texas, and that as late as July, 1863, he was in the Mexican town of Matamoras, from which he voluntarily a second time returned to place himself under the control of the rebel General Magruder. There have been one or two cases where citizens of the insurrectionary States have come into this court and had the hardihood to attempt to cover their disloyal acts by loud assurances of secret loyalty, but there has been no case where a northern man, owing allegiance to both State and country, has left his home to enter the rebel lines and work in rebel navy yards and transport rebel troops, and then had the brazen effrontery to come into this court and prefer a claim whose very foundation is the loyalty of the claimant.
As to the valuable information which the claimant pretends he gave to General Gresham, the story is unsupported by proof or probability, and the tale, if it was told, was probably coined as an excuse to enter our lines after his blockade runner had been captured by our cruisers and the Confederate troops had burnt his cotton; for he says, “I made no effort to return to Pittsburg till 1864, when everything I had had been lost to me.” The excuse for all this dishonor and iniquity was the poverty of the claimant and his laudable desire to save the remnant of his property for his creditors; .but here again his self-convicting testimony shows that he had mbney enough to buy 264 bales of cotton seized near Matamoras and the 800 bales burnt near Alexandria, and to invest $10,000 in gold, in a vessel designed to break our blockade. Money appears to have been the only being to whom the claimant rendered “ true allegiance,” and it seems a most just retribution that he was so entirely forsaken by his deity.
In addition to the testimony of the claimant Gearing, we have been furnished with the testimony of his son. This witness states that he was born in Pittsburg, Pennsylvania, and that he remained there almost entirely till the year 1858 or 1859. He also uses the word “home” three times in connection with Pittsburg. “I did not write home to Pittsburg,” he says; “I never knew of it being written homey After this we read in his testimony the infamous sentences: “ My sympathies were with the south and their cause.” “ I offered, my services to the Confederate government.” • And he then boastfully volunteers this shameful record: “I was an outspoken Confederate. *174 I Vas well understood in Texas to be favorable to tbe Confederate cause. I was so considered throughout the whole contest, and I was so until the final surrender. 1 believe I signed the last payer in the department, and it was the last department which surrendered.”
It is undeniable that there were many well-disposed persons who believed sincerely that they owed a superior allegiance to their own State, and who, at least, may say in a moral mitigation of their offence that they did not go out from the Union until their State had gone, and then that they acted for what seemed the immediate protection of their birth-place, and families, and homes. This witness has no such mitigating circumstances to plead. His “ sympathies were with the South and their cause he “ offered” his “ services to the Confederate governmenthe was favorable to the rebel cause “ throughout the whole contest,” and “ until the final surrender,” and he joined with those who were bringing fire and ruin and the sword upon his birthplace and his “ home.” He is therefore in every moral, as in every legal sense of the word, a traitor, guilty of that offence which has been spoken of as “ the highest civil crime which ' (considered as a member of the community) any man can possibly commit.” (4 Blks., p. 75.) The laws of most communities require the oath of more than a single witness to convict of this crime, regarding it as more heinous than that of peijury, and deeming it more probable that the one will bear false witness than that the other will violate his allegiance. A witness coming into any court and confessing himself convicted of an infamous crime, and particularly of the crime of perjury, would receive but little attention from" the court, and profit the party in whose interest he is nothing. To this witness we give no credence whatever as against his government, nor would such testimony procure a recovery in this court though it were corroborated by the oaths of a thousand witnesses who confess in the same breath their own infamy.
The claimant, Richardson, comes into court apparently a loyal man, and the court has no reason to doubt that he is so. He, however, appears by the same counsel and relies upon the same evidence. He cannot, therefore, complain if the court judge him by this testimony which he himself adduces.
The witness Gearing gives this history of the two steamers which form the basis of the claimants’ demand :
“ During the winter of 1860 and 1861, the boats were running in their legitimate Trinity river trade. In March, of 1861, we were preparing to run the boats to New Orleans, and the rebel State authorities took possession of them; they held them for two or three weeks with *175 out employing them in any service,. Then they were released an'd sent up Buffalo bayou, and laid up by my father. Then, in the fall of that year, father took them out and run them in the Galveston and Houston trade. They were run there until February or March, 1862. Then they were laid up again until the Confederate government seized them. After that, they were run as Confederate government transports, and in other capacities. The “ Stelle ” was used as a- headquarters boat. The ‘.‘Carr” was sent down west among the western-bays. After the “ Stelle ” was seized by the Confederate government, they retained the same pilots and a portion of the engineers. Father remained on the boats until about March, 1862. The Confederate government seized them in the fall of 1862. General Magruder seized them. I did not remain on them after their seizure, in 1862, until May, 1863. Until laid up, in March, 1862, the boats were engaged in the regular business of carrying freight and passengers. During that time we carried Confederate troops or passengers. I do not remember to have carried any ammunition or military stores, except what the troops had with them. I don’t know that we ever carried artillery; we once earned a couple of guns from Galveston up to Houston.”
The “ abandoned or captured property act” (12 Stat. L., p. 820) is the statute under which the-claimants come into court, and from which their rights, as well as their remedy, depend. The object of the act is “ to provide for the collection of abandoned property, and for the prevention of frauds in insurrectionary districts.” The first section declares “ that it shall be lawful” for the Secretary of the Treasury to appoint special agents “ to receive and collect all abandoned or captured property” in any State or Territory designated as in insurrection by the President’s proclamation of 1st July, 1862. The second section provides for the appropriation or sale of “ such property.” The third section provides for the ascertainment and safekeeping of the net proceeds of “ such property ;” and it gives a remedy in this court against the proceeds “ of any such abandoned or captured property.” It is, therefore, evident that the statute does not give a remedy against the proceeds of abandoned or captured property generally, but only against “ such property” as is mentioned in the first section; and therefore it becomes necessary to have recourse to the first in order to ascertain with precision over what proceeds this court may entertain jurisdiction, and what property it was that became entitled to thp benefits of the statute.
The first section does, indeed, use the words “ all abandoned or captured property,” and if it stopped, there we might hold that *176 there was no description of property for the proceeds of which an action would not lie if the defendants treated it as captured and the proceeds found their way into this fund. But the section does not stop with this general description, hut, on the contrary, contains a proviso, which is in these words : “ Provided, That such property shall not include any kind or description which has been used, or which was intended to be used, for waging or carrying on war against the United States, such as arms, ordnance, ships, steamboats, or other water craft, and the furniture, forage, military supplies, or munitions of war.”
This proviso limits and restrains the operation of the first section, and so far as the “hind or description” of the “abandoned or cap-* tured ” property is concerned it limits and restrains the entire act. It is only the proceeds of property allowed by the first section over which the Court of Claims may exercise jurisdiction, not the proceeds of property excepted by that section. The third section does not give the court jurisdiction of the proceeds of all abandoned or'captured property, but only of “suck abandoned or captured property” as is specified by the first section. It cannot help a case that the officers of the government erred, and that property was turned over to the treasury agents which never should have come to their possession, and that the proceeds of this property have been carried into a fund of which they form no proper or legal part, for then the right of action would be the error of the government officers, and the claimant would obtain the benefits of the statute simply because the public agents violated it.
Now the statute says that “ suck, property shall not include any kind or description” “which was used” for “carrying on war against the United States,” such as “steamboats;” and in this case it appears that the “steamboats” of the claimants were “run as Confederate transports,” that “the ‘Stelle’ was used as a headquarters boat,” and the “ Carr ” “ was sent dotm among the western bays,” and that both of them “carried Coffederate troops and passengers.” The counsel for the claimants also says of them in his printed argument: “ The Confederate government seized them in 1862, and kept possession of them until the close of the war, when they were surrendered to the United States forces, in common with other Confederate, property!' So that it really seems difficult to frame a stronger case in favor of the government than the claimants here confess.
The judgment of the court is that the petition be dismissed.